## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SNYDER COMPUTER SYSTEMS,**
**INC. d.b.a. WILDFIRE MOTORS,**

            **Plaintiff,**

    **v.**

**UNITED STATES DEPARTMENT**
**OF TRANSPORTATION,**

            **Defendant.**

**Case No. 2:12-cv-1140**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth Preston Deavers**

---

**UNITED STATES OF AMERICA,**

            **Plaintiff,**

    **v.**

**SNYDER COMPUTER SYSTEMS,**
**INC. d.b.a. WILDFIRE MOTORS,**

            **Defendant.**

**Case No. 2:13-cv-311**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth Preston Deavers**

### OPINION AND ORDER

This consolidated case is a pre-enforcement challenge to a Recall Remedy Order issued

by the National Highway Traffic Safety Administration ("NHTSA") under the National Traffic

and Motor Vehicle Safety Act of 1966, as amended and recodified at 49 U.S.C. Chapter 301, §§

30101–30183 ("Safety Act"). This matter is before the Court on the Motion to Stay of Snyder

Computer Systems, Inc. d.b.a. Wildfire Motors ("Wildfire") (ECF No. 11[1]), Wildfire's Motion

for Discovery (ECF No. 12), the United States of America's and the United States Department of

Transportation's ("United States") Motion for Summary Judgment Affirming the Agency Order

---

[1] All docket references are to Case Number 2:12-1140.

(ECF No. 15), Wildfire's Motion for Summary Judgment (ECF No. 24), and the United States'

Motion for Partial Summary Judgment (ECF No. 26). For the reasons that follow, the Court

**GRANTS** the United States' motions and **DENIES** Wildfire's motions.

## I. ADMINISTRATIVE RECORD

Wildfire is a privately held corporation in Steubenville, Ohio, that imports motor vehicles

into the United States. (Administrative Record[2] ("AR") 495.) One of the vehicles Wildfire

imported is a three-wheeled motor vehicle with an enclosed body, the WF650-C, which is made

in China by Taixing Sandi Motorcycle Co., Ltd. ("TSM") (AR 495, 555.) That vehicle is the

subject of this consolidated lawsuit.

### A. NHTSA Tests and Investigates the WF650-C

As part of its 2009 compliance testing program, NHTSA purchased a Model Year 2009

WF650-C and tested it for compliance with FMVSS No. 122 ("Safety Standard 122"), which

evaluates motorcycle brake systems. (AR 104–53, 496–97.) Although the WF650-C resembles

a passenger car, the vehicle must meet the minimum safety standards for motorcycles because it

has three wheels. 49 C.F.R. § 571.3. NHTSA had the tests performed at the Transportation

Research Center, Inc. ("TRC") in East Liberty, Ohio. (AR 496.) TRC is an independent test

facility with an international reputation for motor vehicle testing. *Id.*

In December 2009, NHTSA notified Wildfire of the WF650-C's "apparent

noncompliance" with multiple requirements of Safety Standard 122. (AR 153.) Specifically,

Wildfire was notified that the WF650-C (1) failed the first effectiveness stopping distance test;

(2) lacked a separate reservoir for each brake circuit, with each reservoir filler opening having its

own cover, seal, and cover retention device; (3) lacked the required reservoir label; and, (4)

lacked a brake failure indicator lamp. *Id.* In NHTSA's notification. (AR 7–10, 154–61.) The

---

[2] The Administrative Record was manually filed with this Court. (ECF No. 25.)

first stopping distance test in the 10-part test sequence under Safety Standard 122 is known as the "first effectiveness" test, and requires the vehicle's brakes to stop the vehicle from 30 m.p.h. within 54 feet. 49 C.F.R. § 571.122. Because the WF650-C failed this first stopping distance test, NHTSA did not have TRC proceed with the remaining stopping distance tests required under Safety Standard 122. (AR 153, 498, 504.)

On March 5, 2010, Wildfire informed NHTSA that when TSM learned of the test results, the Chinese manufacturer "tested the model's brakes at its factory and the result was that the brakes were fine." (AR 83.) Additionally, Wildfire indicated that it had conducted in-house "stopping distance tests with different drivers and different WF650-C motorcycles . . . [and] [e]ach time every driver and every WF650-C motorcycle stopped between 28 and 32 feet without the wheels locking up." *Id.* Wildfire attached to this submission a document titled "Chinese Three Wheel Motorcycle Brake Standard (Based on GB7258) [Chinese writing] Requirement of Brake Distance and Brake Stables." (AR 86.) Half of the additional writing on the page is in Chinese and half is in English. Wildfire also provided a 14-page document titled "Certificate" that reads "Postcode,:225400 is in conformity with ISO 9001:2000 Standard." (AR 87–101.) NHTSA requested that Wildfire provide a translation of these documents, which it failed to do. (AR 156.) That document is written in Chinese. NHTSA had the report reviewed by a native Chinese speaker at NHTSA, who indicated that the report did not appear to show that any stopping distance tests were performed. (AR 502.)

Wildfire next submitted to NHTSA documents that reflect that on May 7, 2010 and May 10, 2010, it conducted in-house brake testing that showed that the WF650-C complied with the first stopping distance test of Safety Standard 122. (AR 459, 461–467.) The information is presented on seven identical documents titled "Data Sheet 5," which is one of the many

documents utilized by TRC in its testing for compliance with Safety Standard 122. Each document shows that the driver was "Donnie" and the test was completed by "Ed." (AR 461–467.) Wildfire also indicated to NHTSA that it believed the testing at TRC failed because the brakes on the vehicle purchased by NHTSA needed adjustment.

On September 28, 2010, "Wildfire representatives along with NHTSA personnel, convened at TRC . . . to investigate the apparent non-compliances." (AR 148.) "Wildfire indicated that it believed brakes needed to be adjusted and bled which would then rectify the stopping distance issue." (AR 148.) NHTSA provided Wildfire the opportunity to make adjustments to the vehicle, and on September 30, 2010, the WF650-C was retested. (AR 148, 505.) During TRC's additional testing of the vehicle, it still failed to stop within the distance specified by the first effectiveness stopping distance requirement. (AR 148, 506.)

On August 18, 2011, TRC issued its Final Report on the compliance testing of the WF650-C. (AR 104–149.) The Report certified that "[a]ll testing was conducted in accordance with the U.S. D.O.T., NHTSA Laboratory Procedure TP 122-02 and/or the corresponding TRC Inc. Test Procedure that was submitted to NHTSA for their approval." (AR 108.) The 45-page Report included: Vehicle Information, Summary of Testing, Test Data, Final Inspection, Master Cylinder Volume Calculations, Vehicle Arrival Condition Report, Vehicle Completion Condition Report, Determination of Master Cylinder Volume, Instrumentation and Calibration, Photographs, Comments, Procedure Modifications, Test Facility, and Notice of Possible Non-Compliance. (AR 107.) The Report presented the information mostly through "Data Sheets," including "Data Sheet 5" that had been utilized by Wildfire in its in-house testing. (AR 109–127.) The Report concluded that the "vehicle did not meet the requirements of FMVSS 122." (AR 108.)

Wildfire was permitted to provide any further information to rebut the apparent

noncompliances, including any third-party testing or more detailed information on the

procedures, equipment, or facilities used to conduct its testing.  (AR 154–161.)

## B.    Wildfire Decides to Recall the WF650-C

In January 2012, NHTSA notified Wildfire that it had not provided sufficient information

to rebut the apparent noncompliances.  (AR154–225.)  NHTSA informed Wildfire that neither it

nor TSM "has shown that the vehicle is compliant."  (AR 156.)  NHTSA continued:

> Although TSM and Wildfire performed their own testing, this testing does not
> adequately address whether the WF650-C complies with FMVSS No. 122 S5.2.1.
> To date, Wildfire/TSM has supplied [NHTSA] with unsupported contentions and
> no data to support the validity of its testing.  As [the] test report furnished by
> TSM is in Chinese.  Even if it was translated into English, [NHTSA] would need
> to determine whether the data were reliable before accepting it.
>
> In certifying a vehicle as compliant with a FMVSS, the "manufacturer
> certifies that the vehicle will comply with safety standards when tested by the
> agency according to the procedures described in the standard."  The test data
> supplied by TSM and Wildfire do not support the conclusion that the vehicle will
> comply with the safety standards when tested by NHTSA according to the
> procedures set forth in FMVSS No. 122.
>
> . . . .
>
> Wildfire also stated that it conducted stopping distance tests with different
> drivers and different WF650-C motorcycles, claiming that every WF650-C
> stopped between 29 and 32 feet without the wheels locking up.  [NHTSA] has
> told Wildfire that it should provide testing results for these tests.  However,
> Wildfire has provided no further information or any details about how its stopping
> distance tests were conducted.
>
> [NHTSA] has determined that these test results were unsupported because they
> did not contain a description of methodology used to conduct the tests and other
> supporting data.  For example, Wildfire has not provided details about the
> instrumentation used to measure vehicle speed, stopping distance and brake pedal
> force, nor any documents verifying the accuracy and calibration of the
> instruments. This information was not forthcoming even after repeated [NHTSA]
> requests.

(AR 156–57) (two footnotes cited 29 U.S.C. § 30112(a)(1) and § 30115(a), and Federal Motor Vehicle Safety Standards; Roof Crush Resistance, 76 Fed. Reg. 15903, 15905 (March 22, 2011) for a discussion of certification).

After explaining in more detail the deficiencies in the materials submitted to it by Wildfire, NHTSA requested that Wildfire recall the vehicle. (AR154–225, 302.) NHTSA, however, gave Wildfire the option of recalling the vehicle or providing a "full and detailed explanation of [its] decision [not to recall the vehicle], including any additional analysis of the problem and test data beyond any past submission of information." (AR 157–60.) NHTSA informed Wildfire that if it did not conduct a recall, "the agency may proceed to an initial decision that these vehicles are noncompliant, which would be published in the Federal Register along with a description of the noncompliance and summary of the testing." (AR 160.) The notification specified that NHTSA's request for Wildfire to "conduct a recall does not constitute a formal conclusion or a final decision that the WF650-C contains a noncompliance pursuant to 49 U.S.C. § 30118, nor does it constitute an order to recall those vehicles. It is not a final agency action." *Id.*

As opposed to submitting additional analysis and test data and/or permitting NHTSA to determine whether it would proceed to an initial decision of noncompliance, Wildfire decided to recall the WF650-C vehicles. (AR 302–09, 313–19, 323–29.) In its noncompliance report, the "Part 573 Report," which Wildfire submitted on January 31, 2012, Wildfire informed NHTSA that it was recalling the vehicle for noncompliances with Safety Standard 122. (AR 302–09.) In the Report, Wildfire acknowledged noncompliance with three of the apparent noncompliances identified by NHTSA, *i.e.*, the master cylinder reservoirs, reservoir labeling, and failure indicator lamp.

6

On February 1, 2012, NHTSA notified Wildfire that it had received its response regarding the three noncompliances but had received no response related to the apparent noncompliance with the stopping distance requirement. (AR 310–12.) NHTSA indicated in the correspondence that the deadline to submit a response was past, so it was "repeating [its] original request" related to the recall. (AR 311.) NHTSA also informed Wildfire that its "request should not delay the remedy process for the noncompliances identified in [its] January 31, 2012 Part 573 report on noncompliance." *Id.* Wildfire amended its Part 573 Report to address the apparent violation related to stopping distance. (AR 313–19.)

On February 9, 2012, NHTSA notified Wildfire that the Amended Part 573 Report was insufficient for several reasons, including that it did not contain a clear and unequivocal statement of noncompliance by Wildfire regarding the stopping distance issue. (AR 320–22.) NHTSA repeated its requests related to recall and informed Wildfire again that its actions related to the apparent stopping distance violation should not delay the remedy process for the noncompliances identified in its January 31, 2012 Part 573 report on noncompliance. Wildfire amended the Part 573 Report a second time, which was accepted by NHTSA. (AR 323–29.)

In the Second Amended Report, Wildfire described each of the four different ways that the brake systems on the WF650-C were noncompliant with Safety Standard 122, stating that the vehicle did not comply with the first effectiveness stopping distance, master cylinder reservoir, reservoir labeling, and failure indicator lamp requirements. (AR 326.) Wildfire described the consequences of noncompliance as follows:

* Without the required brake reservoir label, operators may improperly maintain the brake system.

* With only a single brake fluid reservoir for the entire brake system and no brake failure indicator lamp, in the event of any brake fluid leak, the entire brake system could fail without warning, increasing the risk of a crash.

7

* Failure of the service brakes to stop the motorcycle from 30 m.p.h. within a stopping distance not exceeding 54 feet increases the risk of a crash.

*Id.*

Wildfire explained the reason for the noncompliances as "[o]ur engineers in China didn't monitor the production at the China factory as close as they should have." *Id.* Wildfire chose as the remedy to repair the vehicles and described its repair program to bring the vehicles into compliance. (AR 327.) Wildfire reported that between 197 and 202 vehicles were subject to its recall. (AR 304, 314, 324, 395.) With its original noncompliance report and each amendment, Wildfire told NHTSA that it would send notice to purchasers of those vehicles "as soon as the replacement parts arrive from China and are available for the replacement[,] which is expected to be in approximately 8 weeks." (AR 308, 318, 328.)

In April 2012, Wildfire mailed recall notices to the vehicle owners. (AR 347, 379–89.) Wildfire's recall notices described the four noncompliances with Safety Standard 122 and warned owners "[d]o not operate your Wildfire WF650-C until these safety issues are remedied." (AR 347.) Wildfire assured owners that it would "replace the nonconforming brake fluid reservoir with conforming brake reservoirs, add the required reservoir labeling, install a warning lamp indicating brake failure and replace the front and rear brakes as necessary to meet the standard's stopping distances." *Id.* In the recall notices, Wildfire also informed owners that "the parts should be available after May 14, 2012," and to "contact your Wildfire Motors dealer as soon as possible to arrange a service date." *Id.* In June 2012, Wildfire sent the same recall notice to additional owners, despite the fact that Wildfire had not obtained repair parts on May 14, 2012 as indicated in the recall letter. (AR 338, 379–89, 516.)

On July 17, 2012, Wildfire and NHTSA finalized an agreement whereby Wildfire would remedy the NHTSA-owned WF650-C and provide "a detailed description of every part installed as well as every change or modification made" to the vehicle while in Wildfire's possession. (AR 391–94.) On July 23, 2012, Wildfire obtained the NHTSA-owned WF650-C from TRC. (AR 460.) Wildfire claims that pre-remedy testing showed that the vehicle "stopped from 30 m.p.h. in the high 30 foot range." (AR 460.) Wildfire submitted to NHTSA two documents that state: "The following people have witnessed the stopping distances for the Wildfire WF650-C while riding at 30 mph verified by the vehicle's speedometer and GPS." (AR 468–69.) The two documents are signed by five individuals who appear to be Wildfire employees, including its owner Don Snyder.

TRC conducted testing on the recall remedied WF650-C, and on September 19, 2012 issued its Final Report on the results. (AR 397–453.) The Report concluded that the vehicle did not pass the first effectiveness stopping distance test, the brake failure indicator lamp did not properly activate in any of the ways required, and the lamp read "Service Brake" instead of the wording "Brake Failure," as required Safety Standard 122. (AR 412–14, 430, 452–53, 515.) Similar to the first report issued on this vehicle, this Report certified that "[a]ll testing was conducted in accordance with the U.S. D.O.T., NHTSA Laboratory Procedure TP 122-02 and/or the corresponding TRC Inc. Test Procedure that was submitted to NHTSA for their approval." (AR 401.) This Report too included: Vehicle Information, Summary of Testing, Test Data, Final Inspection, Master Cylinder Volume Calculations, Vehicle Arrival Condition Report, Vehicle Completion Condition Report, Determination of Master Cylinder Volume, Instrumentation and Calibration, Photographs, Comments, Procedure Modifications, Test

Facility, and Notice of Possible Non-Compliance, and presented the information mostly through "Data Sheets." (AR 400–433.)

## C.     NHTSA's Determination

Wildfire reported in its August 21, 2012 quarterly report to NHTSA that it had not inspected or repaired any recalled vehicle. (AR 395–96.)

### 1.     NHTSA's Public Hearing

On September 25, 2012, NHTSA published in the Federal Register a notice of a public hearing to be held on October 15, 2012, to determine whether Wildfire had reasonably met its statutory remedy requirements in conducting the recall. (AR 1–4.) NHTSA invited any interested person to make written or oral presentations of information, views, and arguments.

Wildfire did not attend the public hearing. (AR 491–92.) Instead, Wildfire submitted written comments, indicating that it "has not met the recall requirements because NHTSA has made it impossible to meet the requirements." (AR 459.) Wildfire explained how it tested the vehicle, what those tests results were, how TRC tested the vehicle, how Wildfire adjusted the vehicle and had it retested by TRC. Wildfire "attached pictures of the recall remedy parts [that it] did not send out because Stu Seigel at NHTSA told us there is no reason to make this fix to the vehicle under the recall because they claim the stopping distance is still too great." (AR 460.) Wildfire closed with the request to "repair the vehicles since it has no money for refunds." *Id.*

NHTSA Safety Compliance Engineer Stuart Seigel spoke at the hearing. (AR 492–528.) Seigel talked about NHTSA's compliance testing and investigation of the WF650-C and Wildfire's decision to recall the WF650-C for noncompliance with Safety Standard 122. (AR 496–509.) Seigel noted that Wildfire had not repaired any of the recalled vehicles to make them

10

compliant with the Safety Standard. (AR 510.) He explained why the repair remedy Wildfire

elected did not bring the WF650-C into compliance, and that Wildfire had never adequately

demonstrated otherwise. (AR 510–15, 518–26.) Seigel also described the safety implications of

Wildfire's failure to meet its remedy requirements:

> Wildfire's recall notice to owners recognized the safety risks of the WF650-C's
> non-compliances with [Safety Standard] 122 by advising owners not to operate
> the vehicle until they are remedied. Therefore vehicle owners are either stuck
> with the vehicles that they cannot drive or left to drive unsafe vehicles on the
> roadway. This is a serious problem because the non-compliances could result in
> limited braking and vehicle crashes . . . . Wildfire's long delay in remedying the
> vehicles risks the safety of model year 2009 WF650-C owners and others on the
> road.

(AR 527–28.) Seigel said that "Wildfire has been unresponsive, uncooperative, evasive, and

made false and misleading statements to vehicle owners." (AR 527.)

Seigel additionally spoke about the phone calls and letters NHTSA received from owners

who indicated that they were frustrated with Wildfire's recall and the problems with their

WF650-Cs. (AR 454–58, 474–84, 517–18.) Owners told similar stories about Wildfire giving

them "the runaround." (AR 455, 456, 458, 477.) The owners complained about problems with

their vehicles, including inadequate braking, and they expressed frustration with Wildfire's non-

responsiveness in fulfilling its recall obligations. (AR 455, 474, 517.)

## 2. NHTSA's Order to Wildfire

On November 13, 2012, NHTSA issued its Recall Remedy Order finding that Wildfire

had not reasonably met the Safety Act's recall remedy requirements and instructing Wildfire to

take specific actions to meet those requirements. (AR 542–53, 560–62.) In the Order, NHTSA

recounts how Wildfire's vehicles appeared noncompliant with Safety Standard 122 in four

different ways: the first effectiveness stopping distance requirement from 30 m.p.h., the master

cylinder reservoir requirement, the brake failure indicator lamp requirement, and the reservoir

labeling requirement.  (AR 543 ¶ 5.)  NHTSA noted that it had requested Wildfire to recall the vehicles because Wildfire had neither filed a notice of recall nor provided sufficient information to rebut the apparent noncompliances.  (AR 544 ¶ 9.)  NHTSA observed that, in response to its recall request, Wildfire notified NHTSA that it was recalling the vehicles for the noncompliances with Safety Standard 122.  (AR 544–45 ¶ 10.)

In concluding that Wildfire failed to reasonably meet the Safety Act's remedy requirements, NHTSA reasoned that Wildfire had not repaired any vehicle to make it compliant with Safety Standard 122.  (AR 546 ¶ 15.)  Wildfire's failure to repair was "contrary to representations Wildfire made to NHTSA and vehicle owners about its timeline for implementing a repair remedy."  (AR 546–47 ¶ 16.)  Moreover, NHTSA stated, although Wildfire entered into the agreement to repair the NHTSA-owned vehicle, the vehicle still failed TRC testing and Wildfire did not provide any competent testing information to show that the vehicle was brought into compliance with Safety Standard 122.  (AR 545–46 ¶ 14.)

NHTSA then turned to Wildfire's delay, pushing back the remedy date, and giving customers repair part availability dates that Wildfire knew were incorrect.  (AR 546–47 ¶ 16.)  Since Wildfire kept reporting to NHTSA that it would notify owners of the vehicle in about eight weeks, as soon as the replacement parts arrived from China, the date for notification went from approximately March 26, 2012, with the original Part 573 Report, to April 16, 2012 with the Second Amended Report.  *Id.*  NHTSA acknowledged that Wildfire mailed recall notices to owners on April 18, 2012, in which Wildfire instructed them to "contact your Wildfire Motors dealer as soon as possible to arrange a service date."  *Id.*  But Wildfire delayed the remedy date again by informing owners that parts should be available by May 14, 2012.  *Id.*  NHTSA then explained that Wildfire notified additional customers of the May 14, 2012 date in a notice sent

June 1, 2012, which Wildfire obviously knew was incorrect. *Id.* NHTSA recounted how Wildfire's delay continued when, in response to a NHTSA "Special Order," Wildfire informed it that the repair parts should be available by approximately July 20, 2012, and that it hoped to have all the vehicles repaired by September 5, 2012. *Id.*

NHTSA found that Wildfire's delay in repairing the vehicles and its failure to initiate a refund campaign was unreasonable. (AR 547 ¶ 18.) Wildfire's failure to remedy the vehicles "left owners with noncomplying vehicles that Wildfire told in its recall notices are not safe to drive." (AR 547 ¶ 19.) NHTSA looked at the owner complaints and how those complaints provided further evidence of Wildfire's failure to repair the vehicles and how Wildfire provided owners false, misleading, and contradictory information about the recall. (AR 547–48 ¶¶ 20, 21.)

NHTSA concluded that Wildfire had not met the Safety Act's remedy requirements. (AR 548.) NHTSA ordered Wildfire to reimburse owners the average market value of the vehicle, which it determined to be $3,400, based on the opinion of an independent motor vehicle expert, David Kinney of USAppraisal, LLC. (AR 485–86, 543, 548–49.) NHTSA also ordered Wildfire to take specific steps to ensure that each vehicle owner requesting a refund received the $3,400 and that each vehicle Wildfire bought back was removed permanently from the roads. (AR 549–52.) The steps included Wildfire submitting to NHTSA draft owner notification letters informing owners how to request a refund from Wildfire, as well as Wildfire accounting for all owners by providing NHTSA with a list of notified owners. *Id.*

## II. POSTURE

On December 11, 2012, Wildfire filed in this Court a Complaint for Judicial Review of Final Order. (ECF No. 2) (Case Number 2:12-cv-1140). On March 29, 2013, Wildfire filed its

Motion to Stay, requesting that this Court prevent the United States from enforcing the Recall Remedy Order pending resolution of this case on its merits. (ECF No. 11.) The United States has not attempted to enforce the Recall Remedy Order, thus rendering moot this motion. The Court, therefore, **DENIES** Wildfire's Motion to Stay.

Also on March 29, 2013, Wildfire filed a Motion for Discovery, in which it seeks a discovery order to "to arrange for independent testing of the test vehicle in the custody of the Defendant . . . to assur[e] the court of the public safety of the vehicle." (ECF No. 12.) That motion is fully briefed. (ECF Nos. 16, 21.) As the Court explains in detail below, the testing Wildfire seeks is irrelevant to the issues before this Court. Consequently, the Court **DENIES** Wildfire's Motion for Discovery.

On April 3, 2013, the United States filed in this Court a Complaint for Injunctive and Declaratory Relief and for Civil Penalties. (ECF No. 1) (Case Number 2:13-cv-311). On April 8, 2013, the United States filed an Unopposed Motion to Consolidate, which the Court granted, consolidating these two related cases. The Court directed the parties to file all documents in Case Number 2:12-cv-1140.

On April 22, 2013, the United States filed its Motion for Summary Judgment Affirming the Agency Order, which is currently at issue. (ECF Nos. 15, 22, 23.) Wildfire too filed a Motion for Summary Judgment, which is fully briefed. (ECF Nos. 24, 26, 27, 28.) In these motions, the United States asks this Court to affirm NHTSA's Recall Remedy Order and Wildfire asks that the Court issue an order vacating the Recall Remedy Order.

The United States has also filed a Motion for Partial Summary Judgment, which is ripe for review. (ECF Nos. 26, 27, 28.) In that motion, in addition to requesting enforcement of the Recall Remedy Order, the United States indicates that the motion is only one for partial summary

judgment because in its Complaint filed in Case Number 2:13-cv-311, it asks for civil penalties to be assessed against Wildfire for allegedly violating 49 U.S.C. §§ 30120(a) and (c). That issue would remain if the Court were to grant the United States' dispositive motions.

### III. STATUTORY AND REGULATORY BACKGROUND

#### A.    Safety Act and Federal Motor Vehicle Safety Standards

The Safety Act authorizes the Secretary of Transportation to prescribe motor vehicle safety standards. 49 U.S.C. §§ 30101(1), 30111. The Secretary delegated this authority to the NHTSA. 49 C.F.R. §§ 1.95(a), 501.2(a)(1). The Federal Motor Vehicle Safety Standards set minimum requirements for motor vehicles and their components. 49 U.S.C. § 30111; 49 C.F.R. Part 571.

The safety standards that apply to a motor vehicle depend on the type of vehicle. Types of vehicles include passenger cars, trucks, motorcycles, and buses. 49 C.F.R. § 571.3 (definitions). NHTSA regulates as a "motorcycle" any "motor vehicle with motive power having a seat or saddle for the use of the rider and designed to travel on not more than three wheels in contact with the ground." *Id.* Thus, a three-wheeled vehicle with a fully-enclosed body designed to look like a passenger car or truck is subject to the safety standards for a motorcycle. *See id.* Among the safety standards a motorcycle must meet is Safety Standard 122, Motorcycle Brake Systems, *id.* § 571.122.2; *id.* § S3. The Standard's purpose is to "insure safe motorcycle braking performance under normal and emergency conditions." *Id.* § S2.

To comply with Safety Standard 122, brakes must be capable of stopping the vehicle within specified distances. The Standard includes a ten-part brake test sequence. *Id.*; Table II. The first stopping distance test in the test sequence is known as the "first effectiveness" test, and requires the vehicle's brakes to stop the vehicle from 30 m.p.h. within 54 feet. *Id.* § S5.2.

Standard 122 also includes equipment requirements for brake systems. One such requirement is a separate reservoir for each brake circuit, with each reservoir filler opening having its own cover, seal, and cover retention device. *Id.* § S5.1.2.1. This is known as the master cylinder reservoir requirement, and it enables a vehicle to brake even if one reservoir fails. *Id.* Additionally, Standard 122 requires a reservoir label. 49 C.F.R. § 571.122, S5.1.2.2. This label indicates the type of brake fluid required for the vehicle, and warns that brake fluid should come from a sealed container and that the reservoir filler cap should be cleaned before removing. *Id.*

Safety Standard 122 also requires a light to be mounted in clear view of the driver that reads "Brake Failure." *Id.* § S5.1.3.1. This failure indicator lamp must illuminate when there is a pressure failure in the brake system or when there is low brake fluid. *Id.* § S5.1.3.1(a)(1)-(2). As a check to ensure that the light is functioning, it must also momentarily illuminate when the vehicle is turned on. *Id.* § S5.1.3.1(b).

## B.    NHTSA's Vehicle Compliance Testing

The Safety Act requires motor vehicle manufacturers to self-certify that each vehicle complies with applicable safety standards in effect on the date the vehicle was manufactured. 49 U.S.C. § 30115. No person may sell, offer for sale, or introduce or deliver into interstate commerce a vehicle unless it is complies with applicable safety standards and is certified as compliant. *Id.* § 30112(a)(1). NHTSA endeavors to assure compliance of vehicles sold in the United States through its compliance testing program. (AR 493.) Each year, NHTSA purchases vehicles and tests them to ensure they meet safety standards. *Id.* If a vehicle does not appear to comply with an applicable safety standard, NHTSA notifies the vehicle's manufacturer. *Id.*

### 1. Vehicle Recalls

A manufacturer, which includes an importer, has a duty to ensure that its vehicles comply with applicable safety standards. 49 U.S.C. §§ 30102(a)(5), 30112. If a manufacturer decides in good faith that a vehicle does not comply with an applicable safety standard, it must conduct a recall. *See id.* §§ 30118–30120. When a manufacturer does not agree to recall its vehicles, NHTSA may order the manufacturer to conduct a recall. 49 U.S.C. §§ 30118(a), (b). To order the manufacturer to conduct a recall, NHTSA follows a particular regulatory process, beginning with publishing in the Federal Register notice of an "initial decision" that the vehicle does not comply with an applicable safety standard. *Id.*; *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632, 639–40 (6th Cir. 2004).

### 2. Recall Notification Requirements

A manufacturer who conducts a recall of noncomplying motor vehicle must notify NHTSA, vehicle owners, purchasers, and dealers about the noncompliance. 49 U.S.C. §§ 30118(c)(2), 30119; *see* 49 C.F.R. Part 577.

### 3. Recall Remedy Requirements

A manufacturer who conducts a recall of a noncomplying motor vehicle must remedy the vehicle without charge. 49 U.S.C. § 30120(a)(1). The Safety Act allows the manufacturer to choose one of three remedies: (1) repair the vehicle; (2) replace the vehicle with an identical or reasonably equivalent vehicle; or (3) refund the purchase price of the vehicle, less a reasonable allowance for depreciation. *Id.* A manufacturer who chooses to repair a noncomplying motor vehicle must adequately repair the vehicle within a reasonable time. *Id.* § 30120(c). If it does not, the manufacturer must replace the vehicle or refund the purchase price of the vehicle, less a reasonable allowance for depreciation. *Id.*

A manufacturer conducting a recall must file a report with NHTSA describing its chosen program for remedying a noncompliance and make quarterly reports on the progress of the remedy campaign. *Id.* § 30120(d); 49 C.F.R. Part 573. NHTSA evaluates that information and may conduct testing to ensure that the manufacturer's repair will bring the vehicle into compliance with applicable safety standards.

When there are issues on the adequacy of the remedy, NHTSA may conduct a public hearing to decide whether a manufacturer has reasonably met the remedy requirements in conducting a recall. 49 U.S.C. § 30120(e) ("Hearings about meeting remedy requirements"); *see* 49 C.F.R. Part 557. NHTSA publishes notice of the public hearing in the Federal Register. 49 C.F.R. § 557.7. Any interested person may make written or oral presentations of information, views, and arguments on whether the manufacturer has reasonably met its remedy requirements. 49 U.S.C. § 30120(e); *see* 49 C.F.R. § 557.7. If NHTSA decides that a manufacturer has not reasonably met its remedy requirements, NHTSA must order the manufacturer to take specified action to meet those requirements. 49 U.S.C. § 30120(e). NHTSA may also take any other action authorized by the Safety Act, including actions to enforce the order and for civil penalties. *See id.* §§ 30120(e), 30163, 30165(a).

## IV. STANDARD

Both parties agree, and are correct, that NHTSA's Recall Remedy Order is a final agency action subject to review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), which confines this Court's review to the administrative record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977). Because the Safety Act does not expressly specify a standard of review for recall remedy orders, the challenged "decision may be set aside only if

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C.

s 706(2)(A), or 'unwarranted by the facts to the extent that the facts are subject to trial de novo

by the reviewing court,' 5 U.S.C. s 706(2)(F)." *Upjohn Mfg. Co. v. Schweiker*, 681 F.2d 480,

483 (6th Cir. 1982). "If the Court cannot 'evaluate the challenged agency action on the basis of

the record before it, the proper course, except in rare circumstances, is to remand to the agency

for additional investigation or explanation.'" *Karst Envtl. Educ. & Prot., Inc. v. Fed. Highway

Admin.*, 12-5008, 2014 WL 943364 (6th Cir. Mar. 12, 2014) (quoting *Florida Power & Light Co.

v. Lorion*, 470 U.S. 729, 744 (1985)).

## A.     Arbitrary and Capricious Review

In applying the "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" standard, "the focal point for judicial review should be the administrative

record already in existence, not some new record made initially in the reviewing court." *Camp v.

Pitts*, 411 U.S. 138, 142 (1973); 5 U.S.C. § 706(2)(A). To determine whether a decision is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, a "court

must consider whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.*, 401

U.S. at 416 (citations omitted). "Although this inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one. The court is not empowered to

substitute its judgment for that of the agency." *Id.* "Nonetheless, the agency must articulate a

rational connection between the facts found and the choice made, and must provide something in

the way of documentary support for its action." *GTE Midwest, Inc. v. F.C.C.*, 233 F.3d 341,

344-45 (6th Cir. 2000) (internal citations and quotation marks omitted).

**B.    De Novo Review and Supplementation of the Record**

Wildfire contends that that this is a case in which the Court must determine whether

Wildfire is "entitled to a trial de novo or to supplement the record and" whether the agency

findings are supported by "substantial evidence" as is required by 5 U.S.C. § 706(2)(E).  (ECF

No. 22 at 6.)  Wildfire, therefore, asserts that the Court should consider two affidavits that

allegedly show misconduct on the part of NHTSA.  Wildfire's arguments are not well taken.

1.    **De Novo Review**

The Sixth Circuit has explained:

> When de novo review of agency action is not expressly required by statute, it is
> the exception rather than the rule. *United States v. Carlo Bianchi & Co.*, 373 U.S.
> 709, 715 (1963).  "(D)e novo review is appropriate only where there are
> inadequate factfinding procedures in an adjudicatory proceeding, or where
> judicial proceedings are brought to enforce certain administrative actions."  *Camp
> v. Pitts*, 411 U.S. 138, 142 (1973).  *See also Doraiswamy v. Secretary of Labor*,
> 555 F.2d 832, 839-42 (D.C. Cir.1976) (collecting cases).

*Schweiker*, 681 F.2d at 483 (parallel citations omitted).  The Court will address both ways in

which it is appropriate to engage in a de novo review, neither of which supports application of

that standard in the instant action.

a.    **Inadequate Factfinding Procedures in Adjudicatory Proceedings**

With regard to whether there were inadequate factfinding procedures in an adjudicatory

proceeding, the first way in which a party may be entitled to de novo review, Wildfire contends

that the October 15, 2012 public hearing "had none of the hallmarks of a fair and just

adjudication hearing" because there was no sworn testimony taken, no right to subpoena

witnesses, and no right to depositions.  (ECF No. 22 at 7–9.)  It is, however, well settled that

factfinding procedures are not inadequate when an agency makes its decision through informal

adjudication rather than formal, trial type procedures.  *Florida Power & Light v. Lorion*, 470

U.S. at 744 ("A formal hearing before the agency is in no way necessary to the compilation of an agency record . . . agencies typically compile records in the course of informal agency action."); *Schweiker*, 681 F.2d at 483 ("Although these factfinding procedures were informal, we do not agree . . . that all informal factfinding procedures, no matter how complex and detailed, are inadequate in the sense that they are subject to de novo review.") (citations omitted).

Here, NHTSA's Remedy Recall Order came after an established process of informal agency adjudication including a public hearing. *See* 49 U.S.C. § 30120(e); 49 C.F.R. Part 557. By regulation, the public hearing did not involve the right of cross-examination or other trial-type procedures.  49 C.F.R. § 557.7 (noting that "[s]ections 556 and 557 of title 5 [which require trial-type hearings], U.S.C., do not apply to hearings held under this part").  As the United States correctly explains in its briefing, because NHTSA's Recall Remedy Order followed an informal agency process, it falls into the vast swath of agency action known as informal adjudication. NHTSA's agency action is neither rulemaking nor formal adjudication required by statute to be made "on the record" after an opportunity for a formal hearing. *See Florida Power & Light*, 470 U.S. at 744 ("As the actions of the Commission in compiling a 547-page record in this case demonstrate, agencies typically compile records in the course of informal agency action.  The APA specifically contemplates judicial review on the basis of the agency record compiled in the course of informal agency action in which a hearing has not occurred.").  Informal agency action does not equal an inadequate fact finding proceeding.

With regard to the factfinding procedures employed by NHTSA, they were far from inadequate.  NHTSA followed the applicable statutory and regulatory criteria and in the three years which elapsed from the time that the agency notified Wildfire of the apparent noncompliances until it issued the Recall Remedy Order.  NHTSA gathered considerable

evidence as is reflected in the 562 page Administrative Record, met with Wildfire representatives on several occasions, permitted retesting, brake adjustments, submissions of independent testing results, and any other submissions Wildfire chose to submit. Indeed, on several occasions NHTSA laid out in detail the deficiencies in Wildfire's testing submissions and other materials, always permitting Wildfire to supplement the record to remedy the defects. The Court finds that NHTSA's factfinding procedure was not deficient and certainly does not warrant a de novo review. *See e.g., Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.*, 286 F.3d 382, 387 (6th Cir. 2002) (finding "no deficiency in the factfinding procedures that would warrant a de novo hearing . . . [where] Kroger was permitted to (1) submit enormous amounts of material, (2) meet multiple times with RAA officials, (3) amend its claim twice, and (4) supplement the record in any way it saw fit"); *Schweiker*, 681 F.2d at 483 (factfinding procedures adequate where "FDA followed the applicable statutory and regulatory criteria . . . . [and] [d]uring the two and one-half years which elapsed between the submission of the Boots application and approval by FDA of that application, FDA gathered considerable evidence with respect to the safety and effectiveness of" the drug at issue).

### b.    Enforcement of Certain Administrative Actions

The certain administrative actions referred to in the second way a de novo review is authorized, are proceedings to enforce nonadjudicatory agency action. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415 ("And, there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action."). Wildfire appears to argue that de novo review is authorized here because its case was consolidated with an enforcement action filed by the United States and Wildfire has raised issues that were not before the agency. Wildfire submits two affidavits representing issues

that Wildfire claims were not before the agency during administrative review and show

misconduct on the part of NHTSA.

The United States argues, *inter alia*, that this exception to arbitrary and capricious review

applies only to actions to enforce *nonadjudicatory* agency action, which, it maintains, is not what

type of action at issue here. This Court agrees. The Recall Remedy Order is the result of action

*adjudicatory* in nature. *See e.g., Sierra Club v. Peterson*, 185 F.3d 349, 366 (5th Cir. 1999) on

reh'g, 228 F.3d 559 (5th Cir. 2000) ("any agency process that results in a final disposition, except

for rulemaking, is necessarily adjudication."); *Citizens to Preserve Overton Park, Inc.*, 401 U.S.

at 415 ("public hearing conducted by local officials for the purpose of informing the community

about the proposed project and eliciting community views on the design and route" is

"nonadjudicatory, quasi-legislative in nature").

However, even if the action before this Court were considered an action for enforcement

of a nonadjudicatory agency action, Wildfire is still not entitled to the de novo review. The first

affidavit submitted by Wildfire refers to testing that was done at TRC after the WF650-C had

failed the stopping tests and Wildfire was permitted to make adjustments to the brakes at the

TRC facility before re-testing. In that affidavit, Donald Castner, an employee of Wildfire, avers:

> On September 28, 2010, Don Snyder, Alan Tipton and I went to [TRC] in
> East Liberty, Ohio.
>
> Don Snyder, Alan Tipton and I of Wildfire Motors and Stu Siegel (sic)
> and Andre Jones were at TRC discussing how to fix the brakes on the WF650-C.
>
> Don Snyder and Alan Tipton took a walk to the other side of the building
> to discuss some things. Stu Siegel (sic) and Andre Jones were still looking at the
> WF650-C, I was still in the same location. I heard Andre Jones say "it shouldn't
> be too hard to fix." Stu Siegel (sic) said "It doesn't matter, we have to make sure
> they don't pass."

(ECF No. 24-1.)

Leaving aside the affidavit's hearsay issues raised by the United States, the information in this affidavit was not before the administrative agency as a result of inaction *by Wildfire*. Wildfire knew about this alleged statement made by Seigel, but did not raise it during the administrative investigation. In its submission to NHTSA before the public hearing on October 2012, Wildfire addressed the September 28, 2010 brake adjustments, explaining that "Andre Jones of NHTSA watched us work on [the vehicle]. He saw the air bleed from the brake system, saw the brake pedal full and hard afterwards, and in fact, told Stu Seigel who was also present, he 'thinks they will work OK now." (AR 460.) While Wildfire made no mention of Seigel's alleged response to Jones, (*i.e.*, it doesn't matter, we have to make sure they don't pass), it clearly knew of the conversation but chose not to bring it before the NHTSA. It cannot now claim foul play.

Regardless of this, however, Wildfire elected to recall the vehicles for all four noncompliances *after* Seigel's alleged statement. The vehicle had failed the tests nearly a year before Stuart's alleged statement. (AR 153.) The documentation that Wildfire does not dispute receiving made clear that Wildfire was permitted to forego the recall, pursue third party testing, and submit any evidence it wished in an attempt to rebut the NHTSA's finding of apparent noncompliance. If Wildfire believed it was a victim of foul play, it could have arranged for testing at another testing facility. Instead it chose to recall the vehicles. Wildfire cannot sit on its rights and now claim prejudice.

The second affidavit submitted by Wildfire is from Don Snyder, the principal officer of Wildfire, in which he avers that "[b]efore the October 15, 2012 hearing, Stuart Seigel told me that there was nothing Wildfire could [do] to make their [sic] vehicles pass the NHTSA requirements." (ECF No. 27-1.) This issue however *was* raised during the administrative process. That is, in the same submission discussed immediately above, that Wildfire provided before the public hearing,

Wildfire asserted that regardless of the fact that it had received the remedy parts from China, "Stu Seigel at NHTSA told us there is no reason to make this fix to the vehicle under the recall because they claim the stopping distance is still too great." (AR 460.) Viewing this submission in the context of the entire record, the agency concluded that Wildfire, having agreed prior to the public hearing to undertake a recall, could not now complain about the fairness of the entire testing. (AR 547) ("Wildfire's failure to initiate a refund campaign for the [Model Year] 2009 WF650-C is unreasonable.").

Finally, as the Court discusses in its analysis below, even if the Court were to permit supplementation of the record with these two affidavits, the Recall Remedy Order would still be affirmed.

### 2. Substantial Evidence

As the United States correctly explains, Wildfire's attempt to mix Section 706(2)(E)'s "substantial evidence" standard into its discussion of standard of review is in error. That standard applies only where there is a formal, trial-type, "on the record" hearing required by statute. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 414 (1971) ("Review under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, 5 U.S.C. § 553 (1964 ed., Supp. V), or when the agency action is based on a public adjudicatory hearing. *See* 5 U.S.C. § 556, 557 (1964 ed., Supp. V)."); *Camp v. Pitts*, 411 U.S. at 140–42 ("[T]he proper standard for judicial review of the [agency's] adjudications is not the 'substantial evidence' test which is appropriate when reviewing findings made on a hearing record, 5 U.S.C. s 706(2) ).").

3.    **Supplementation of the Record**

The Court next addresses Wildfire's request to supplement the Administrative Record.
Wildfire argues that, even if it is not entitled to a de novo review of the Administrative Record, it
is entitled "to supplement the record when the agency engages in bad faith in the sense of willful
misconduct." (ECF No. 22 at 10.)   Wildfire relies upon the statement of Donald Castner,
discussed *supra*, in which he states that he overheard NHTSA engineer Stuart Seigel make "the
statement at TRC that 'we have to make sure they don't pass.'"

"Courts may permit plaintiffs to conduct discovery depositions of agency officials when
there are grounds to suspect bad faith or improper behavior not apparent from the administrative
record." *Charter Twp. of Van Buren v. Adamkus*, 188 F.3d 506 (6th Cir. 1999) (citing *Citizens to
Preserve Overton Park*, 401 U.S. at 420-21); *Community Fed. Savings and Loan Ass'n v.
Federal Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D. D.C.1983)).   "To overcome the
presumption of validity of agency action, however, the plaintiff must show specific facts
indicating that the challenged action was reached because of improper motives." *Id.* (citing
*Friends of the Shawangunks, Inc., v. Watt*, 97 F.R.D. 663, 667-68 (N.D. N.Y.1983)).   "And
where there are administrative findings that were made at the same time as the decision, as [in
the case before this Court], there must be a strong showing of bad faith or improper behavior
before such inquiry may be made." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420.

The United States contends that Wildfire's evidence falls far short of the strong showing
of bad faith that it must meet.  This Court agrees.  That is because, when viewed in light of the
record of NHTSA's thorough investigation, reasoned evaluation, and careful procedures
followed in this case, the Administrative Record lends no support to the belief that Seigel—
regardless of his alleged statement to the contrary—could have somehow "rigged" these

extensive and repeated tests so that Wildfire would fail. The record is clear that the claims
Wildfire now makes against Seigel were known to Wildfire before both the agreed recall and the
public hearing.

However, as the Court stated *supra*, even if Wildfire were permitted to supplement the
record with the Castner Affidavit it does not change the outcome of this case.

## V. ANALYSIS

Wildfire argues that the Recall Remedy Order is "arbitrary, capricious, and abuse of
discretion, and otherwise not in accordance with law because it was based upon obviously fatally
flawed reports." (ECF No. 24 at 6.) Despite admitting to three other "easily repairable issues
with the motorcycle brake systems," Wildfire maintains that failing to make any repairs during
its recall campaign is permissible since the "[t]he alleged stopping distance problem is an
impossible problem to fix, because it is non-existent." (ECF No. 22 at 2.) Wildfire contends that
testing performed by TRC was "rigged to make sure the vehicle did not pass" the stopping
distance test and that the testing was "riddled with errors." (ECF No. 27 at 18.) Wildfire further
claims it was subject to prejudicial bias because the tests were conducted at TRC, asserting that
"[i]t is almost laughable to suggest that TRC at the Honda-owned facility in East Liberty, Ohio,
where NHTSA is a major tenant and is TRC's primary customer, is an 'independent agency.' . . .
[and because] Honda . . . is a major competitor of Wildfire . . ." (ECF No. 24 at 6.) Wildfire
concludes:

> Clearly Wildfire has been prejudiced, because non-compliant tests are in reality
> no tests at all. Wildfire's tests showed consistent and full compliance with
> stopping distance requirements. [AR 459-471.] It is arbitrary and capricious to
> give greater weight to non-compliant test reports performed at Wildfire's
> competitor's facility than to Wildfire's tests. It is arbitrary and capricious to insist
> that Wildfire's tests be fully complaint to be credible when the tests that the
> Government relies upon clearly were not.

*Id.* at 7.

Wildfire's arguments, however, miss the mark. This is not a case where NHTSA decided that Wildfire's vehicles did not comply with the stopping distance requirement and then ordered Wildfire to conduct a recall. (AR 160) (NHTSA's request for Wildfire to conduct a recall "does not constitute a formal conclusion or final decision that the WF650-C contains a noncompliance pursuant to 49 U.S.C. § 30118, nor does it constitute an order to recall those vehicles".) This is a case where Wildfire decided to recall its vehicles, including for the stopping distance noncompliance, and then failed to follow through with its statutory obligations. Wildfire does not address the regulatory requirements it triggered when it decided that the WF650-Cs do not comply with Safety Standard 122 and issued a recall. The Safety Act does not permit Wildfire to recall vehicles and then ignore the remedy requirements which flow from that decision. When Wildfire announced a recall it "set into motion the great grinding gears of a statutorily mandated and administratively overseen national recall process." *Winzler v. Toyota Motor Sales*, 681 F.3d 1208, 1212 (10th Cir. 2012) (citing 49 U.S.C. §§ 30118(c), 30120(a)). That statutory process obligated Wildfire to notify owners, which it did, and remedy the noncompliances by repairing the vehicle, replacing the vehicle, or refunding the purchase price less reasonable depreciation, which it did not do. 49 U.S.C. §§ 30120(a),(c).

In an attempt to sidestep the statutory requirements that followed from its own recall, Wildfire argues that NHTSA "forced" it to recall the vehicles and give false information to customers. But the record shows otherwise. More than two years ago, Wildfire faced the decision of whether to include the stopping distance noncompliance in its recall or face a public meeting, press release, and a formal agency decision on that apparent noncompliance under 49 U.S.C. §§ 30118(a) and (b). (AR 321.) Wildfire included the stopping distance noncompliance

in its recall, "decid[ing] in good faith that the vehicle . . . does not comply" with Safety Standard No. 122. 49 U.S.C. § 30118(c)(2); (AR 323–29) (Second Amended Part 573 Report); (AR 347–55) (Safety Recall notice to owners).

If Wildfire believed that the tests were biased, rigged, or in any way inaccurate, it had the opportunity to present the agency with its own third-party tests demonstrating compliance with the stopping distance requirement. During the administrative process, NHTSA gave Wildfire the opportunity to continually supplement the record, including exploring the third-party testing with Wildfire, asking it to identify the testing facility that was purportedly testing Wildfire's vehicles. (AR 330-43, 334.) Wildfire responded that "[w]e have asked Taixing Sandi Motorcycle Co., Ltd. for that information and do not have it yet." (AR 334.) Wildfire never provided any information on that alleged third-party testing.

Instead, Wildfire provided in-house tests that it performed after acknowledging noncompliance and attempting a repair remedy on the NHTSA-owned WF650-C. The only information from those tests consisted of statements from individuals who appear to be Wildfire employees who allegedly "witnessed the stopping distances for the Wildfire WF650-C while riding at 30 mph verified by vehicle's speedometer and GPS." (AR 468–69.) Wildfire did not submit any detailed information on the procedures, equipment, or facilities used to conduct the testing. (AR 523.) NHTSA thus found that "Wildfire has not provided competent test information to rebut the results of" the NHTSA testing. (AR 545.)

Moreover, it is no help to Wildfire if the Court were to accept the evidence upon which it relies to support its argument, *i.e.*, the Castner Affidavit. Wildfire reiterates that Seigel's statement shows that the tests were rigged to prevent the WF650-C from passing. However, Seigel's statement is irrelevant to the analysis at hand because Wildfire chose to recall the

vehicles for all four noncompliances *after* Seigel's alleged statement instead of pursuing any third-party testing.

With regard to the relevant inquiry before this Court, the United States contends the Court should affirm the Recall Remedy Order because, "[t]he administrative record conclusively establishes[3] that Wildfire has not 'reasonably met the remedy requirements' of the Safety Act. 49 U.S.C. § 30120(e). . . . [and] NHTSA followed the Safety Act in ordering Wildfire "to take specified action to meet those requirements." The United States' argument is well taken.

The Safety Act provides that "[i]f a manufacturer decides to repair a . . . noncomplying motor vehicle . . . and the repair is not done adequately within a reasonable time, the manufacturer shall" either "replace the vehicle . . . without charge with an identical or reasonably equivalent vehicle" or "refund the purchase price, less a reasonable allowance for depreciation." 49 U.S.C. § 30120(c). Here, the Court easily finds that the United States' conclusion that the recall remedy repairs offered by Wildfire were not done adequately within a reasonable time is not arbitrary, capricious, an abuse of discretion, or contrary to law. Indeed, there is no dispute that of the nearly 200 vehicles that were recalled, not one was repaired.

Because NHTSA reasonably found that Wildfire did not repair the vehicles within a reasonable time, the Safety Act required NHTSA to order Wildfire "to take specified action to meet those requirements." 49 U.S.C. § 30120(e). The specified action NHTSA took was to order Wildfire to refund the purchase price less depreciation, which it set at $3,400 for each WF650-C. 49 U.S.C. § 30120(c). The Recall Remedy Order found that "[a]s of October 2012, the average market value of a [Model Year] 2009 WF650-C is $3,400. The average market value of the [Model Year] 2009 WF650-C is equivalent to the purchase price, less a reasonable

---

[3] The United States frames the issue in this way because it argues that under any standard of review the Recall Remedy Order is entitled to affirmance.

allowance for depreciation." (AR 543.) Wildfire argues that this repurchase amount is not in accordance with the Safety Act because it is not an individualized assessment of the depreciation of each particular recalled vehicle. This Court disagrees.

NHTSA based the $3,400 amount on the opinion of an independent motor vehicle expert, Accredited Senior Appraiser David Kinney of USAppraisal, LLC. (AR 485–86, 543, 548–49.) Kinney's methodology included sampling more than 1.5% of the actual U.S. Wildfire WF650-C market population in all geographic regions. (AR 485.) USAppraisal also sought the advice of dealers in alternative vehicles such as Wildfire's WF650-C. (AR 486.) Considering asking prices, sales data compiled, and found reported sales yielded an estimate of $3,400 as of October 2012. The Court finds that NHTSA acted within the discretion afforded by the statute to "order the manufacturer to take specified action" to meet the Safety Act's remedy requirements. NHTSA's use of market value as equivalent to "purchase price, less a reasonable allowance for depreciation" is consistent with the Safety Act. (AR 543.) As the United States correctly points out, this is not a case where NHTSA could "check the Blue Book." Wildfire's recall itself, as well Appraiser Kinney's opinion letter, shows that Wildfire's vehicles are part of a very small, niche market.

Moreover, Wildfire has never offered evidence of an alternative refund amount or even an alternative methodology for determining the refund amount. Wildfire knew NHTSA was conducting a public hearing on whether Wildfire had reasonably met its obligation to remedy noncompliances. Wildfire knew NHTSA could order it to take "specified action," including ordering Wildfire to refund the purchase price less a reasonable allowance for depreciation. Yet Wildfire stated in its comments to NHTSA before the hearing only that it had "no money for refunds." (AR 460.)

It was not arbitrary, capricious, an abuse of discretion, or contrary to law to order Wildfire to repurchase at the $3,400 average market value.  This decision provided a way for NHTSA to administer the recall in a way that was fair and practical for both Wildfire and the owners while determining average market value as the best way to approximate the "purchase price, less a reasonable allowance for depreciation" across approximately 200 vehicles.  *See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984) (an agency's interpretation of its governing statute is entitled to judicial deference where Congress has not directly spoken to the precise issue).  Indeed, it would be unreasonable for the agency to be required to administer a recall that required it to set a refund amount on a vehicle-by-vehicle basis or to rely on Wildfire to do so when it had already failed to carry out *any* of its recall remedy obligations.

Accordingly, the Court finds that the Recall Remedy Order is not arbitrary, capricious, an abuse of discretion, or contrary to law.

## VI. CONCLUSION

Based on the foregoing, the Court **DENIES AS MOOT** Wildfire's Motion to Stay (ECF No. 11 ), **DENIES** Wildfire's Motion for Discovery (ECF No. 12), **GRANTS** the United States' Motion for Summary Judgment Affirming the Agency Order (ECF No. 15), **DENIES** Wildfire's Motion for Summary Judgment (ECF No. 24), and **GRANTS** the United States' Motion for Partial Summary Judgment (ECF No. 26).  The Court therefore **AFFIRMS** the Recall Remedy Order issued by NHTSA on November 13, 2012, and **ORDERS** Wildfire to comply with that Order immediately.  The Court will schedule a telephone status conference forthwith to

determine the procedure by which to address the United States' request for the imposition of civil penalties against Wildfire, which is the only remaining issue in this case.

     **IT IS SO ORDERED.**


03-31-2014

**DATE**

 

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

33